IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

**BRIAN PEASTER**                                                                                 **PLAINTIFF**

**V.**                  **No. 3:22-CV-00018-JM-PSH**

**KILOLO KIJAKAZI,**
**ACTING COMMISSIONER of**
**SOCIAL SECURITY ADMINISTRATION**                    **DEFENDANT**

### RECOMMENDED DISPOSITION

This Recommended Disposition (Recommendation) has been sent to United States District Judge James M. Moody, Jr. Either party may file written objections to this Recommendation. Objections should be specific and should include the factual or legal basis for the objection.

To be considered, objections must be received in the office of the Court Clerk within 14 days of this Recommendation. If no objections are filed, Judge Moody can adopt this Recommendation without independently reviewing the record. By not objecting, parties may also waive the right to appeal questions of fact.

I. **Introduction:**

Brian Peaster applied for disability benefits on March 29, 2020, alleging disability beginning September 27, 2018. (Tr. at 11). His claims were denied both initially and upon reconsideration. *Id*. After conducting a hearing, an Administrative Law Judge ("ALJ") denied his application on June 29, 2021. (Tr. at 24). The Appeals

Council later denied his request to review the decision. (Tr. at 1). Therefore, the ALJ's decision stands as the final decision of the Commissioner.

Mr. Peaster now seeks judicial review of the decision. For the reasons stated below, the Court should affirm the decision of the Commissioner.

## II.     The Commissioner's Decision:

The ALJ found that Mr. Peaster had not engaged in substantial gainful activity since the alleged onset date of September 27, 2018. (Tr. at 13). At Step Two of the sequential five-step analysis,[1] the ALJ found that Mr. Peaster had the following severe impairments: post-traumatic stress disorder (PTSD), anxiety, mood disorder, substance abuse disorder, spinal degenerative changes, left shoulder degenerative changes, right hip degenerative changes, bilateral knee degenerative changes status post right knee arthroscopic repairs, migraine headaches, diabetes mellitus, and obesity. (Tr. at 13-14).

The ALJ considered these impairments, including Mr. Peaster's substance use, and found that the severity of his condition would meet the criteria for Listing

---

[1] Using a five-step sequence, the ALJ determines: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. § 404.1520(a)–(g).

12.04 (Depressive, Bipolar and Related Disorders).[2] (Tr. at 15). But the ALJ concluded that if Mr. Peaster were to stop the substance use, his other impairments would not meet or medically equal the criteria for any listing, including Listing 12.04. (Tr. at 17). Even without the substance use, however, the ALJ found his other Step Two impairments would remain severe. (Tr. at 16).

The ALJ then determined what Mr. Peaster's residual functional capacity ("RFC") would be if he stopped his substance use. (Tr. at 19). The ALJ found that Mr. Peaster would be able to perform work at the light exertional level, with additional limitations: (1) he could only occasionally climb, balance, stoop, kneel, crouch, and crawl; (2) he would have less-than-constant use of his upper extremities, but he could frequently use them to reach, handle, finger, and feel; (3) he would be limited to only occasional overhead reaching bilaterally; (4) he could only perform indoor work with occasional exposure to atmospheric conditions, such as fumes, noxious odors, dusts, mists, gases, and poor ventilation; (5) he could not work in loud noise environments; (6) he could perform simple, routine, repetitive work, but not at a production-rate pace; and (7) he would be limited to simple work-related decisions and occasional interaction with supervisors, coworkers, and the public. *Id*.

Relying upon the testimony of a Vocational Expert ("VE"), the ALJ found that Mr. Peaster was unable to perform his past relevant work as a welder and truck

---

[2] *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.

3

driver, but his RFC (without substance use) would allow him to perform other jobs in the national economy such as price tag ticketer and routing clerk. (Tr. at 23-24). The ALJ therefore concluded that the substance use disorder was a contributing factor material to the determination of disability, because Mr. Peaster would not be disabled if he stopped his substance use. (Tr. at 24). Accordingly, the ALJ found that he was not disabled. *Id*.

## III. Discussion:

### A. Standard of Review

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

The United States Supreme Court recently held that "whatever the meaning of 'substantial' is in other contexts, the threshold for such evidentiary sufficiency [in

4

Social Security Disability cases] is not high. Substantial evidence . . . is more than a mere scintilla. It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

It is not the task of this Court to review the evidence and make an independent decision. Neither is it to reverse the decision of the ALJ because there is evidence in the record which contradicts her findings. The test is whether there is substantial evidence in the record as a whole which supports the decision of the ALJ. *Miller*, 784 F.3d at 477.

### B. Mr. Peaster's Arguments on Appeal

Mr. Peaster contends that substantial evidence does not support the ALJ's decision to deny benefits. He argues that the ALJ erred in determining his RFC and in finding that substance abuse was a material contributing factor to Mr. Peaster's disability. After reviewing the record as a whole, the Court concludes that the ALJ did not err in denying benefits.

A claimant's RFC represents the most that the claimant can still do despite his physical and mental limitations. *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011). "The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Hensley v. Colvin*,

829 F.3d 926, 931-32 (8th Cir. 2016) (cleaned up). Although the ALJ bears the primary responsibility for determining the RFC, Mr. Peaster bears the burden of persuasion to prove disability and demonstrate his RFC. *Martise*, 641 F.3d at 923.

*First*, Mr. Peaster argues that he is unable to perform the standing and walking requirements of light work due to pain in his back, hip, and knees, as well as decreased sensation in his legs due to neuropathy.[3] A lumbar MRI scan in October 2020 showed a disc extrusion at L4-5 and other degenerative changes. (Tr. at 2269-70). That month, a pain specialist examined him. She noted lumbar spine tenderness and a stiff posture with decreased range of motion, but his straight leg raise testing was negative and he transferred from sitting position to the exam table without difficulty. (Tr. at 2316). Clinical notes indicate Mr. Peaster later received lumbar injections that provided him significant pain relief and "dramatic" functional improvement. (Tr. at 2322). Such marked improvement suggests his back pain is not completely disabling. *See Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002) ("An impairment which can be controlled by treatment or medication is not considered disabling.").

Similarly, Mr. Peaster underwent two surgeries for his knee pain that greatly improved his mechanical symptoms. (Tr. at 2207-2233). He was advised to resume

---

[3] "[T]he full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." Social Security Ruling ("SSR") 83–10, 1983 WL 31251, at *6 (1983).

activities as tolerated following surgery. Although he continued to complain about his leg pain, his orthopedist attributed the pain to bursitis in his right hip, for which he was prescribed home exercise and a steroid injection. (Tr. at 19, 2207). *See Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (finding lack of functional restrictions, coupled with physician's encouragement to exercise, inconsistent with disability). Mr. Peaster also complained of a burning sensation in his lower extremities, and testing showed mild sensory neuropathy in his left leg. (Tr. at 2123, 2140). However, he had normal motor function in his extremities with no deficits. (Tr. at 2316-17).

The ALJ acknowledged that his knee and back limitations were "clearly severe" and accordingly limited Mr. Peaster to light work and occasional postural activities. (Tr. at 21). But the ALJ also noted that he did not require any assistive devices, and he was able to perform yardwork and take care of his young granddaughter, who lives with him. (Tr. at 20, 2275, 2288). These activities are inconsistent with his claims of disabling pain, and they indicate that Mr. Peaster is capable of performing the limited range of light work contemplated in his RFC. *See Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005). Substantial evidence supports this portion of the RFC assessment.

*Second*, Mr. Peaster contends that his RFC does not capture the concrete consequences of his migraine headaches. He faults the ALJ for rejecting a migraine form filled out by his primary care physician, Kristi Statler, M.D. (Tr. at 996). Dr.

7

Statler opined that Mr. Peaster's migraines would interfere with his ability to work and cause him to miss more than one day of work per week. (Tr. at 996). The ALJ found the form inconsistent with Mr. Peaster's normal examinations, his normal test results, and his activity level. (Tr. at 21, 592, 598). Additionally, the ALJ rejected the opinion as outdated because it was completed over a year prior to the alleged disability date. (Tr. at 21). The ALJ's evaluation was guided by the appropriate factors, and his findings are borne out by the record. *See* 20 C.F.R. § 404.1520c(c) (listing factors the ALJ considers in evaluating medical opinions).

Mr. Peaster argues that the ALJ was required to include migraine-related limitations in his RFC because he found them to be a severe impairment at Step Two. Although the ALJ did not explicitly link the migraines to particular RFC limitations, the ALJ did limit Mr. Peaster to indoor work and restrict his exposure to atmospheric conditions and loud noise. (Tr. at 19). Mr. Peaster believes that his RFC should include a limitation for intermittent time off-task to tend to his migraine symptoms. But he only cites one treatment note within the relevant time period for support, and that note does not describe any symptoms or functional limitations resulting from migraines. (Tr. at 2128). Mr. Peaster has failed to show error in this regard.

*Third*, Mr. Peaster argues that the ALJ erred in finding that drug use was material to his disability. He challenges the sufficiency of the medical evidence that the ALJ relied on to support this finding. He contends that his mental health

symptoms[4] are independently attributable to his depression, anxiety, and PTSD. The Court is unpersuaded.

When a claimant is found disabled, but the record contains medical evidence of a drug addiction, the ALJ must determine whether the claimant would still be disabled without the drug use. 20 C.F.R. § 404.1535. To do so, the ALJ evaluates which of the claimant's mental and physical limitations would remain if he stopped using drugs, and then determines whether any or all of the remaining limitations would be disabling. *Id*. Mr. Peaster bears the burden of proving that his substance abuse was not a contributing factor material to the disability decision. *Estes*, 275 F.3d at 725.

The ALJ first determined that Mr. Peaster was disabled when he was using drugs because his mental impairments met the criteria of Listing 12.04. The ALJ cited instances of Mr. Peaster's impulsive aggression toward others, hallucinations causing distractibility, and decreased need for sleep. (Tr. at 15). The ALJ concluded that these signs and symptoms caused "marked" limitations in three areas of mental

---

[4] Mr. Peaster alleges that he suffers from intrusive memories, flashbacks, and nightmares related to his PTSD, which cause him to be hypervigilant, irritable, angry, short-tempered, and aggressive. *Doc. 12* at 16. He alleges that his depression manifests as low energy, low mood, anhedonia, sleep disturbance, feelings of hopelessness and helplessness, and feelings of overwhelm. *Id*. He also alleges that he has generalized anxiety disorder which causes him excessive worry, discomfort around groups of people, feeling on edge, panic attacks, and racing thoughts. *Id*.

functioning: interacting with others, adapting or managing oneself, and concentrating, persisting, or maintaining pace. *Id*.

In the absence of substance abuse, however, the ALJ found that these criteria were not met because he no longer had marked limitations in functioning. For example, after stopping his amphetamine use, Mr. Peaster's relationship with his wife significantly improved. (Tr. at 2284). He told his therapist: "I am not the same person I was. I am calmer. More clear headed. My wife actually wrote me a letter to say how much better I have been since I have been home." (Tr. at 2272). He was also able to take care of his one-year-old granddaughter, who lived in his home. (Tr. at 2288). This evidence supports the ALJ's finding of improvement in the functional area of interacting with others.

Mr. Peaster also showed improvements in his ability to concentrate, persist, and maintain pace once he stopped using drugs. He told his therapist that he was more motivated than before, and his focus had improved to the point that he could finish tasks. (Tr. at 2275). He no longer suffered from intrusive hallucinations, suicidal thoughts, and paranoia. (Tr. at 2293). The ALJ acknowledged that Mr. Peaster still showed limitation in this area without the drug use, but the evidence overall supported finding a lower degree of limitation.

The record also showed that Mr. Peaster was better able to adapt or manage himself without drugs. He reported sleeping well at night. (Tr. at 2308). And

although he reported some lingering irritability and racing thoughts, he told his psychiatrist that these symptoms had improved with medication. *Id*. His therapist noted a "dramatic change in his presentation" after stopping the drug use. (Tr. at 2272). Mr. Peaster admitted that daily methamphetamine use had been fueling his psychosis, and he ceased making delusional or paranoid comments in therapy. *Id*. The ALJ did not err in finding improvement in this area of functioning.

Substantial evidence supports the ALJ's conclusion that Mr. Peaster's mental impairments no longer caused at least two "marked" limitations—and therefore no longer met the criteria of Listing 12.04—once he stopped using drugs. The ALJ accounted for Mr. Peaster's remaining mental impairments in the RFC by limiting him to simple work, at a slower pace, with limited social interaction. Mr. Peaster has failed to prove that his mental impairments required any further limitations.

*Fourth*, and finally, Mr. Peaster argues that the ALJ failed to properly consider the remaining medical opinions in his case, including a physical assessment from Dr. Statler and mental assessments from both Dr. Statler and his counselor. Dr. Statler's checkbox physical assessment form indicates that Mr. Peaster could not sit or stand for more than 15 minutes at a time, and his impairments would constantly interfere with his attention and concentration and cause him to miss more than four days of work per month. (Tr. at 1685-86). But Dr. Statler does not list any diagnoses, clinical findings, or supportive explanations for her opinions. And, as the ALJ noted,

11

the opinions are inconsistent with the normal examination results from his clinic visit that day. *See* 20 C.F.R. § 404.1520c(b)(2) (supportability and consistency are the most important considerations in evaluating the persuasiveness of medical opinions). Dr. Statler's mental assessment suffers from the same defects. (Tr. at 1687-88). The ALJ found that it was unsupported and inconsistent with the normal exam results in the Dr. Statler's treatment notes (including normal affect and mood) and Mr. Peaster's activity level. (Tr. at 22, 2095, 2100). Moreover, the ALJ found that both assessments failed to consider the effects of Mr. Peaster's active substance use on his functioning. The ALJ properly determined that these assessments were not persuasive.

Mr. Peaster's counselor also filled out a mental assessment form, which his medication manager reviewed and co-signed. (Tr. at 2068-2074). The assessment was submitted in April 2020, which coincides with Mr. Peaster's admission to his counselor that he had been using meth throughout the duration of their treatment relationship. (Tr. at 1866, 2272). The ALJ found the assessment non-persuasive because it was poorly supported and inconsistent with the contemporaneous treatment notes showing a "dramatic change in his presentation" and Mr. Peaster's own reports of stable mood, better focus, and more task completion since he stopped using drugs and began new medication. (Tr. at 2272, 2275). The ALJ also found that the assessment failed to take Mr. Peaster's drug use into account. The ALJ

adequately supported his reasons for finding the assessment unpersuasive, and the Court finds no error.

IV. **Conclusion**:

For the reasons stated above, the Court finds that substantial evidence supports the Commissioner's decision that Mr. Peaster was not disabled. Judgment should be entered in favor of the Commissioner.

IT IS SO ORDERED this 12th day of January 2023.

_____
UNITED STATES MAGISTRATE JUDGE